NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

—————————————

Rockingham
No. 2015-0446

THE STATE OF NEW HAMPSHIRE

v.

CARLOS GONZALEZ, III

Argued: March 9, 2017
Opinion Issued: October 27, 2017

Joseph A. Foster, attorney general (Sean P. Gill, assistant attorney general, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Carlos Gonzalez, III, appeals his convictions on two counts of aggravated felonious sexual assault. See RSA 632-A:2 (2016). The defendant argues that the Trial Court (Wageling, J.) erred when it vacated the pro hac vice admission of two out-of-state attorneys, thereby depriving him of his right to chosen counsel under Part I, Article 15 of the State Constitution and the Sixth Amendment to the Federal Constitution. Because we conclude that the trial court sustainably exercised its discretion when it found that its interest in the fair, efficient, and orderly administration of justice outweighed the defendant's right to counsel of his choice, we affirm.

The record reflects the following facts.  A grand jury indicted the defendant on fifteen counts of aggravated felonious sexual assault alleged to have occurred on various occasions between 1992 and 1994.  The victim, L.J., was the defendant's stepdaughter.  L.J. was between ten and twelve years old at the time of the assaults.  At that time, the defendant, L.J., her sister, and her mother all resided together.

More than a year prior to trial, the defendant, through his New Hampshire counsel, Attorney Kurt Olsen, moved for the admission of two out-of-state attorneys for the limited purpose of representing him in only this case.  See Super. Ct. Crim. R. 19(a) (repealed eff. Mar. 1, 2016) ("An attorney, who is not a member of the Bar of this State . . . shall not be allowed to engage in the trial or hearing in any case, except on application to appear pro hac vice . . . .").  Rule 19 required the out-of-state attorney to file a verified application with the court in which she or he wished to appear, detailing, among other things, the applicant's disciplinary history and prior pro hac vice appearances here and in other jurisdictions.  Super. Ct. Crim. R. 19(b).  Rule 19(c) provided:

> The court has discretion as to whether to grant applications for admission pro hac vice.  An application ordinarily should be granted unless the court finds reason to believe that:
>
> (1) such admission may be detrimental to the prompt, fair and efficient administration of justice;
>
> (2) such admission may be detrimental to the legitimate interests of parties to the proceedings other than the client(s) the applicant proposes to represent;
>
> (3) one or more of the clients the applicant proposes to represent may be at risk of receiving inadequate representation and cannot adequately appreciate that risk; or
>
> (4) the applicant has engaged in such frequent appearances as to constitute common practice in this State.

Super. Ct. Crim. R. 19(c).  The defendant asked the trial court to allow the pro hac vice admission of Attorneys Alexandria and Walter Jacobs, who are father and daughter, and both of whom were licensed attorneys in Massachusetts at that time.  In December 2013, the trial court granted Alexandria's application for pro hac vice admission, subject to the condition that local counsel be present at all hearings.  Subsequently, in March 2014, the trial court granted Walter's application.

2

At a pre-trial hearing in April 2014, the State raised concerns about the relationship that Walter and Alexandria had with the victim and her family between 1992 and 1994. Specifically, the State represented that Walter was L.J.'s primary care physician during the time of the assaults, and that he was a close friend of the defendant at that time. The State also represented that Alexandria was a close friend of L.J. and her sister during the same time period. Based upon these relationships, the State expressed concern about the propriety of the representation of the defendant by Walter and Alexandria. Due to this concern, and in light of the fact that the defendant was also represented by local counsel, the State notified the court that it intended to file a motion to preclude Walter and Alexandria from cross-examining L.J. and her sister at trial.

In response to the concerns raised by the State, Walter confirmed that L.J. was his patient during the relevant time period, but disputed that he served as L.J.'s primary care physician. He asserted that his treatment of L.J. was not "related to any issues that are in this case" and that, within the context of the physician-patient relationship, they had no "communication about anything related to this case whatsoever." Alexandria also minimized the nature of her relationship with L.J. and her sister, asserting that it was only an "acquaintanceship due to my father and their stepfather being friends." She represented that it had been over a decade since she had contact with L.J. or her sister, and that she was "never informed of any kind of an allegation." Walter and Alexandria argued that their relationships with L.J. and her family did not pose a problem with regard to their representation of the defendant. Nonetheless, Walter informed the trial court that he did not intend to cross-examine L.J.

Shortly thereafter, the State filed a motion to preclude Walter and Alexandria from cross-examining L.J., her sister, and her mother. Two days later, the State filed a motion to vacate Walter's pro hac vice admission. The State argued that Walter's pro hac vice admission should be vacated under Rule 19. It asserted that, when Walter applied for pro hac vice admission, he had failed to disclose his medical disciplinary history as well as his personal and physician-patient relationship with L.J., her sister, and her mother. It argued that, in light of this new information, Walter's pro hac vice admission "would be detrimental to the legitimate interests of the parties to the proceedings other than the defendant." See Super. Ct. Crim. R. 19(c)(2).

The trial court granted the State's motion to preclude Walter and Alexandria from cross-examining certain witnesses. In the same order, it vacated both attorneys' pro hac vice admissions. Relying upon Rule 19(c), the trial court reasoned that the Jacobses' prior relationships with the defendant, L.J., and her sister and mother could make them necessary witnesses at trial, thereby interfering with the defendant's representation and impeding the

3

prompt administration of the trial.  Further, it observed that the Jacobses' inability to cross-examine key State's witnesses could render the defendant's representation inadequate or hinder the prompt administration of the trial. The trial court also explained that Walter's failure to disclose his history of medical discipline, and the nature of that disciplinary history, raised concerns about whether he would be able to comply with court rules and the New Hampshire Rules of Professional Conduct.  Additionally, the trial court noted that, because the defendant was represented by local counsel who had been involved in all stages of the proceedings, the defendant would not be prejudiced if the pro hac vice admissions were vacated.

The defendant filed a motion to reconsider, which the trial court denied. Subsequently, Olsen, the defendant's local counsel, withdrew from the case, and the defendant proceeded to trial with court-appointed counsel.  After a two–day trial, a jury convicted the defendant on two counts of aggravated felonious sexual assault.  This appeal followed.

The defendant claims that the trial court's vacating of Walter's and Alexandria's pro hac vice admissions violated his right to counsel under both the State and Federal Constitutions.  The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend VI.  Similarly, Part I, Article 15 of the New Hampshire Constitution provides that "[e]very subject shall have a right to . . . be fully heard in his defense, by himself, and counsel" and that "[e]very person held to answer in any crime or offense punishable by deprivation of liberty shall have the right to counsel at the expense of the state if need is shown."  "[A]n element of [the right to counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him."  United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006); see also Wheat v. United States, 486 U.S. 153, 159 (1988).

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).  The issue presented in this appeal — whether a trial court's order vacating the pro hac vice admission of defendant's chosen counsel implicates his state constitutional right to counsel of choice — is an issue of first impression for this court.  We, therefore, look to other jurisdictions for guidance.  See State v. Kelly, 159 N.H. 390, 392 (2009).

The United States Supreme Court has not addressed the issue of whether a defendant's federal constitutional right to counsel is implicated by a trial court's decision concerning the pro hac vice admission of counsel.  See Leis v. Flynt, 439 U.S. 438, 442 n.4, 443 (1979) (holding that because an attorney has no cognizable property interest under the Fourteenth Amendment

4

to the United States Constitution, the Constitution does not require a state court to afford an attorney procedural due process when assessing his pro hac vice application, but noting that court was not addressing the issue of the client's interests in being represented by an out-of-state attorney). However, the federal circuit courts of appeal that have addressed this issue have all held that the pro hac vice admission of counsel implicates the defendant's federal constitutional right to counsel of choice. See Panzardi-Alvarez v. United States, 879 F.2d 975, 980 (1st Cir. 1989) ("[A] decision denying a pro hac vice admission necessarily implicates constitutional concerns." ); United States v. Gonzalez-Lopez, 399 F.3d 924, 929 (8th Cir. 2005) ("[A] defendant's right to the counsel of his choice includes the right to have an out-of-state lawyer admitted pro hac vice." (quotation omitted)), aff'd and remanded, 548 U.S. 140 (2006); United States v. Walters, 309 F.3d 589, 592 (9th Cir. 2002) (same); United States v. Collins, 920 F.2d 619, 626 (10th Cir. 1990) ("Although the admission of attorneys pro hac vice is committed to the discretion of the district courts, denial of admission pro hac vice in criminal cases implicates the constitutional right to counsel of choice."), superseded by statute on other grounds as recognized in Lewis v. C.I.R., 523 F.3d 1272, 1276-77 (10th Cir. 2008); Fuller v. Diesslin, 868 F.2d 604, 607 (3d Cir. 1989) ("Thus, we conclude that the right to counsel pro hac vice is encompassed analytically within the right to counsel of choice, and as such should be examined within the analytic framework generally employed in right to counsel of choice cases."). We find these cases instructive and their reasoning persuasive; therefore, we hold that a decision regarding the pro hac vice admission of counsel implicates the defendant's constitutional right to chosen counsel under Part I, Article 15 of the New Hampshire Constitution.

However, a defendant's right to counsel of his choice — including out-of-state counsel — is not absolute; it is "circumscribed in several important respects." Wheat, 486 U.S. at 159; see State v. Linsky, 117 N.H. 866, 880 (1977) ("The right to counsel of one's choice is not unlimited . . . ."). The right does not extend to "an advocate who is not a member of the bar," "an attorney he cannot afford or who for other reasons declines to represent" him, or "an attorney who has a previous or ongoing [attorney-client] relationship with an opposing party." Wheat, 486 U.S. at 159.

A defendant's right to chosen counsel is limited by the trial court's "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" Gonzalez-Lopez, 548 U.S. at 152 (quoting Wheat, 486 U.S. at 160); see also United States v. Ries, 100 F.3d 1469, 1471 (9th Cir. 1996) (observing that a defendant's choice of counsel may be limited to serve a "compelling purpose" such as "[e]nsuring the ethical and orderly administration of justice" (quotation omitted)); Panzardi-Alvarez, 879 F.2d at 980 ("We have consistently recognized that the right to one's counsel of choice

5

will be limited when insistence upon it would disproportionately disadvantage the government or interfere with the ethical and orderly administration of justice." (quotation omitted)); United States v. Dinitz, 538 F.2d 1214, 1219 (5th Cir. 1976) ("[T]he Sixth Amendment's right to choice of counsel merely informs judicial discretion—it does not displace it.").

A trial court's interest in the ethical, fair, and orderly administration of justice may outweigh a defendant's right to chosen counsel when, for example, the trial court determines that a defendant has asserted his right to dismiss counsel as a dilatory tactic. See, e.g., Linsky, 117 N.H. at 880 ("[A] court can compel a defendant to go to trial with present counsel if the court determines, within its sound discretion, that the objections to counsel are dilatory tactics or otherwise unwarranted."). Similarly, "[w]hen circumstances exist involving the selection of counsel with the sole or primary purpose of causing the recusal of the judge . . . the right to counsel of choice can be overridden." In re BellSouth Corp., 334 F.3d 941, 956 (11th Cir. 2003). It logically follows, therefore, that a trial court may deny the pro hac vice admission of a defendant's chosen counsel if it finds that the attorney would impair the fair, efficient, and orderly administration of justice. When a trial court is faced with a conflict between a defendant's right to select counsel and the courts' interest in the ethical, fair, and orderly administration of justice, the trial court must balance these competing interests. See Gonzalez-Lopez, 548 U.S. at 152 ("We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . .").

The defendant argues, that once admitted, pro hac vice counsel cannot be disqualified under standards that are more stringent than those imposed upon members of the New Hampshire Bar. He also contends that the trial court erred when, acting pursuant to its power under Rule 19, it "disqualified" his attorneys. We disagree with this latter contention and hold that the trial court did not err.

As a threshold matter, we do not agree with the defendant's characterization of the trial court's action: he contends that the trial court "disqualified" his out-of-state counsel following their admission. Rather, the trial court's actions here can best be characterized as a reconsideration and correction of its prior exercise of discretion in approving the Jacobses' pro hac vice admissions. See State v. Haycock, 139 N.H. 610, 611 (1995) ("[T]he trial court's discretionary powers are continuous. They may be exercised, and prior exercise may be corrected, as sound discretion may require, at any time prior to final judgment." (quotation omitted)).

Although the trial court initially granted the Jacobses' applications to appear pro hac vice, at that time it was not aware of their past personal relationships with the defendant, L.J., her sister, or her mother. After the

State brought these facts to the trial court's attention, the State requested that the trial court "revisit[] and reconsider[]" Walter's admission, so that it could consider the existence and nature of those relationships. The trial court then reconsidered the Jacobses' applications in light of new information about their pre-lawsuit conduct, and after taking that information into account, it vacated its prior orders, and denied the applications. Cf. United States v. Howell, 936 F. Supp. 767, 768, 773 (D. Kan. 1996) (granting motion to reconsider attorney's pro hac vice admission based upon fact that, in initial application, attorney seeking admission had omitted information about prior pro hac vice appearances in other jurisdictions and misled court about standing with bar). The trial court did not act based upon the conduct of counsel during the proceedings; rather, it acted after it was made aware of previously undisclosed facts relating to the Jacobses' past conduct. Thus, we construe the trial court's order not as "disqualifying" Walter and Alexandria, but as reconsidering their pro hac vice applications based upon new information, vacating its prior admission orders, and denying those applications. See Edwards v. RAL Auto. Group, 156 N.H. 700, 705 (2008) (stating that interpretation of a trial court order presents a question of law for this court).

The defendant argues, citing Collins, that "[o]nce admitted, pro hac vice counsel cannot be disqualified under standards and procedures any different or more stringent than those imposed upon regular members of the . . . bar," Collins, 920 F.2d at 626. We agree with the defendant that Collins stands for this general proposition. See id.; see also Belue v. Leventhal, 640 F.3d 567, 576 (4th Cir. 2011) ("[C]ourts have increasingly proved willing to conclude that pro hac vice attorneys should not be disqualified under standards and procedures any different or more stringent than those imposed upon regular members of the district court bar." (quotation omitted)); Ries, 100 F.3d at 1471 (adopting Collins language). However, in Collins, the Tenth Circuit Court of Appeals also implicitly recognized that trial courts have more discretion to deny applications for pro hac vice admission than they do to disqualify an attorney after admission. See Collins, 920 F.2d at 626; see also Ries, 100 F.3d at 1471 (recognizing that standards for admission of pro hac vice attorneys need not be the same as those seeking permanent admission and that court may reject pro hac vice application where compelling purpose warrants denial); Martens v. Thomann, 273 F.3d 159, 175 (2d Cir. 2001) (distinguishing between revocation of pro hac vice admission, which is a sanction and therefore triggers due process protection, and denial of admission, which does not). Consequently, we hold that the trial court here did not err when, pursuant to Rule 19 — and based upon previously undisclosed information — it reconsidered the Jacobses' pro hac vice applications.

We next consider whether the trial court erred when, applying Rule 19, it vacated the Jacobses' admissions and denied their pro hac vice applications. Because this decision implicated the defendant's state constitutional right to

7

counsel of choice, we review the trial court's application of Rule 19 to determine whether it sustainably exercised its discretion in balancing the defendant's right to counsel of choice and the court's interests in the ethical, fair, and orderly administration of justice. Cf. State v. Dukette, 127 N.H. 540, 543-44 (1986) (reviewing trial court's decision to deny defendant's request to allow counsel to withdraw from the case under abuse of discretion standard); State v. Lambert, 147 N.H. 295, 296 (2001) (explaining that we now refer to abuse of discretion standard as unsustainable exercise of discretion standard); see also Panzardi-Alvarez, 879 F.2d at 980-81 (reviewing denial of application for pro hac vice admission under unsustainable exercise of discretion standard); Ries, 100 F.3d at 1472 (determining that trial court was within its discretion in denying counsel's pro hac vice application). When we determine whether a trial court has sustainably exercised its discretion, "we are really deciding whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." Lambert, 147 N.H. at 296. "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

The trial court found that, based upon the prior personal relationships of Walter and Alexandria with L.J. and her family, their pro hac vice admissions were not in the interests of the ethical, fair, and orderly administration of justice. The trial court relied upon five factors in reconsidering and denying the Jacobses' pro hac vice admissions: (1) the Jacobses' potential to become witnesses; (2) the Jacobses' potential impact upon the truth-seeking function of trial; (3) the Jacobses' potential detriment to the adequacy of the defendant's defense; (4) Walter's divided loyalties between the defendant and his former patients; and (5) Walter's omission of medical disciplinary history from his application and the basis for that disciplinary history. We conclude that the trial court's findings and rulings were reasonable and supported by an objective basis in the record and, therefore, that the defendant has failed to establish that the trial court unsustainably exercised its discretion.

Specifically, we conclude that the five factors were properly relied upon by the trial court, are supported by an objective basis in the record, and provide reasonable grounds for the trial court's decision. As to the first factor, it was reasonable for the trial court to be concerned that Walter and Alexandria could become trial witnesses. Cf. N.H. R. Prof. Conduct 3.7(a) (except under certain circumstances, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness"). Although the extent of the relationships was disputed, it was uncontested that, at the time of the assaults, Walter had a physician-patient relationship with L.J., her sister, and her mother, and that Alexandria was friendly with L.J. and her sister. Given these relationships, which occurred at the very time of the assaults, it was reasonable for the trial court to find that both attorneys might have factual

8

information relevant to the case. Indeed, both attorneys represented to the trial court that L.J. did not disclose the assaults to them. L.J.'s failure to disclose the assaults to either her treating physician or childhood friend could have proven exculpatory. Cf. State v. Woodard, 146 N.H. 221, 226 (2001) (concluding that evidence of prior disclosures of sexual assault is relevant and admissible under some circumstances).

Although Walter and Alexandria averred that they had no intention of serving as trial witnesses, the record establishes that there was a substantial risk of that eventuality. As explained below, the issue of Walter's prior medical care of L.J.'s family, and Alexandria's relationship with L.J. and her sister, had the potential to become relevant to help explain the demeanor of L.J., her sister, and her mother at trial. Further, as the defendant acknowledged in pleadings filed with the trial court, if the issue of Walter's prior medical care of the State's witnesses became an issue at trial, Walter would be placed "in the impossible position of becoming a witness." We conclude that the record establishes an objective basis for the trial court's concern. Cf. In re Rappaport, 558 F.2d 87, 90-91 (2d Cir. 1977) (upholding trial court's denial of attorney's pro hac vice application in part because it was "highly probable" that attorney would appear as witness for defense upon retrial).

Regarding the second factor, there is an objective basis in the record supporting the trial court's concern that the Jacobses' representation of the defendant could undermine the truth-seeking function of trial. L.J., her sister, and her mother, each expressed discomfort at the prospect of being cross-examined by Walter and/or Alexandria. Specifically, L.J. and her sister informed the prosecutor that "it would be incredibly intimidating and awkward and uncomfortable to be cross-examined by either" Walter or Alexandria. Notwithstanding the representations of Walter and Alexandria as to the limited nature of their relationships with these witnesses, it was the witnesses' subjective view of their relationships that had the potential to impact the witnesses' demeanor at trial. See State v. Giles, 140 N.H. 714, 718-19 (1996) (observing that a witness's tone of voice and demeanor are useful tools in assessing his or her credibility); cf. United States v. Patterson, 68 F. App'x 351, 353 (3d Cir. 2003) (finding relevant witness's "dislike" for prosecuting authority based upon its recent prosecution of her son); State v. Legere, 157 N.H. 746, 761 (2008) (finding testimony explaining why some witnesses might fear retaliation and be reluctant to testify relevant to jury's assessment of witnesses' credibility). Indeed, the impact of the witnesses' relationships with defense counsel in this case is unique — it is qualitatively different from the relationship that ordinarily exists between defense counsel and a witness for the State. However, absent full disclosure, the unique and highly personal nature of the relationship between counsel and the witnesses would not have been discernible by the jury. Conversely, while knowledge of the nature of the personal relationships between defense counsel and L.J., her sister, and her

mother would have been relevant to a jury assessing the witnesses' credibility, disclosure of those relationships also would have been problematic. Introduction at trial of the Jacobses' personal relationships with these witnesses would have made it likely that the Jacobses would become witnesses. We, therefore, conclude that there is an objective basis in the record for the trial court's concern that the Jacobses' continuing representation would undermine the truth-seeking function of trial.

As to the third factor, it was reasonable for the trial court to be concerned about the effect of the attorneys' <u>pro</u> <u>hac</u> <u>vice</u> admissions on the adequacy of the defense. In its order, the trial court also ruled that, if the Jacobses were to represent the defendant, they would be precluded from cross-examining L.J., her sister, and her mother. On appeal, the defendant does not challenge this aspect of the trial court's ruling. Given this significant limitation, the trial court reasonably concluded that Walter's and Alexandria's inability to cross-examine three key witnesses could materially detract from the defendant's defense. Additionally, had either attorney become a witness, the defendant would have lost a member of his defense team mid-trial, leading to juror confusion.

With respect to the fourth factor, it was reasonable for the trial court to be concerned that Walter's previous physician-patient relationship with L.J., her sister, and her mother, could adversely impact his representation of the defendant or, alternatively, that his representation of the defendant could compromise his ability to honor his duty of confidentiality to his former patients. The parties appear to agree that, because Walter had a former physician-patient relationship with several State's witnesses, his situation is analogous to that in which an attorney represents a party in a case in which the attorney's former client is an adverse witness or party. We, too, think that Walter's relationship to his former patients is analogous to an attorney's relationship with a former client, and we therefore look to New Hampshire Rule of Professional Conduct 1.9 for guidance. Rule 1.9 provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> . . . .
>
> (c) A lawyer who has formerly represented a client in a matter . . . shall not thereafter:

10

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

N.H. R. Prof. Conduct 1.9(a), (c).

The defendant argues that, applying these principles here, Walter's prior physician-patient relationship with L.J. did not conflict with Walter's representation of the defendant because the former and current "representation" did not involve the same or a substantially related matter. We disagree. "Matters are 'substantially related' for purposes of [Rule 1.9] if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." N.H. R. Prof. Conduct 1.9 2004 ABA Model Code Comment [3]. Here, Walter, as L.J.'s physician at the time of the assaults, had been in a position to obtain confidential information that could materially advance the defendant's position at trial: that L.J. failed to disclose the assaults to him or to other treating physicians, and that she did not exhibit any signs or symptoms of sexual assault. Additionally, as to L.J., her sister, and her mother, Walter could have used his knowledge of their physical or mental health to impeach their credibility. Cf. id. (to establish a conflict, former client need not reveal confidential information learned by attorney, but can establish conflict based upon the nature of the services attorney provided to former client and information that would ordinarily be learned when providing such services).

The potential for a conflict between Walter's representation of the defendant, on the one hand, and Walter's duties to his former patients, on the other hand, was especially acute here, where Walter could have directly confronted his former patients during cross-examination. Although we have not had occasion to address the application of Rule 1.9 when an adverse witness is the cross-examining lawyer's former client, other courts have recognized the special ethical conundrum presented in that circumstance. See Goodrich v. Goodrich, 158 N.H. 130, 137 (2008) (noting that we have had few opportunities to examine conflicts of interest under Rule 1.9 and, consequently, that we look to decisions in other jurisdictions for guidance). The Eleventh Circuit has aptly described the problem of "divided loyalties":

11

> If the conflict could cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. Indeed, it is also true that disqualification is equally appropriate if the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest. In short, the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards.

United States v. Ross, 33 F.3d 1507, 1523 (11th Cir. 1994); see also United States v. Culp, 934 F. Supp. 394, 398 (M.D. Fla. 1996) ("The ethical canons thus present the lawyer with a Hobson's choice: the lawyer must either seek to elicit confidential information from the former client, or refrain from vigorous cross-examination." (footnote omitted)); State v. Ehlers, 631 N.W.2d 471, 480 (Neb. 2001) ("In this case, the concern is that the attorney-client relationship with [former client] gave rise to continuing obligations of loyalty and confidentiality and that if the confidences were kept, the representation of [the defendant] might prove to be ineffective due to the inability of [attorney] to conduct a thorough cross-examination.") overruled on other grounds by Heckman v. Marchio, 894 N.W.2d 296 (Neb. 2017).

Here, Walter, as former physician for L.J., her sister, and her mother, had a continuing duty under New Hampshire and Massachusetts law to maintain the confidentiality of that relationship. See Nelson v. Lewis, 130 N.H. 106, 109 (1987) ("Th[e] [physician-patient] privilege belongs to the patient, who may prevent the physician from revealing statements whose confidentiality the patient wishes to preserve."); see also Alberts v. Devine, 479 N.E.2d 113, 119 (Mass.1985) (holding that physicians owe a duty to their patients "not to disclose without the patient's consent medical information about the patient, except to meet a serious danger to the patient or to others"). On the other hand, Walter's representation of the defendant gave rise to a countervailing duty — to zealously represent the defendant. See State v. Gullick, 120 N.H. 99, 105 (1980).

The competing duties owed by Walter to L.J., her sister, and her mother, on the one hand, and to the defendant, on the other hand, give rise to the same "divided loyalties" conundrum described above. Had Walter been permitted to cross-examine L.J., her sister, and her mother, he would have been placed in the untenable position of choosing between improperly using privileged information during his cross-examination, on the one hand, and refraining from zealous cross-examination in order to protect patient confidentiality, on the other hand. Alternatively, the solution proposed by the defendant — requiring local counsel to cross-examine these witnesses — had the potential to

12

render counsel's representation of the defendant ineffective. Thus, we conclude that there was an objective basis in the record for the trial court's concern that Walter's relationships with the defendant and his family made his involvement in the case detrimental to the prompt and fair administration of justice.

Concerning the fifth factor, the trial court found that Walter's failure to disclose his medical disciplinary history, and the basis for that discipline, bore upon his fitness to appear pro hac vice. The defendant argues that "[b]ecause the court did not find that Walter had an obligation to disclose that disciplinary record in his motion and verified application [under Rule 19(b)(5)] the court could not properly have held against him the failure to do so." Further, he asserts that the trial court erred when "it disqualified Walter on the basis either of the content or the non-disclosure of his prior disciplinary record." We disagree.

We construe the trial court's order as faulting Walter, not because his omission constituted a technical violation of Rule 19(b)(5), but, rather, because the nature of his disciplinary history, and his failure to disclose it, were indicative of Walter's general inability to comply with court rules and New Hampshire's Rules of Professional Conduct. In other words, Walter's failure to act with candor and voluntarily disclose this information — in his application or otherwise — gave the court "reason to believe that" his pro hac vice admission would be "detrimental to the prompt, fair and efficient administration of justice" under Rule 19(c)(1). Super. Ct. Crim. R. 19(c)(1); see Ries, 100 F.3d at 1471 ("Where, as here, an out-of-state attorney strongly suggests through his behavior that he will [not] abide by the court's rules and practices—thus impeding the orderly administration of justice . . . the judge may . . . reject his pro hac vice application." (quotation omitted)).

There is an objective basis in the record for this conclusion. As the trial court noted, Walter was censured in 2012 by the New Hampshire Board of Medicine (the Board of Medicine) "as a result of his failure to disclose to [the Board of Medicine] that he had been investigated and as a result resigned his medical license in Massachusetts." Walter failed to voluntarily disclose his history of omitting relevant information in official proceedings — much like he omitted disclosure to the trial court of his prior physician-patient relationship with L.J., her sister, and her mother. Although Walter may not have been required to disclose these facts under Rule 19(b)(5), there is no doubt that he did have a duty of candor towards the trial court. See N.H. R. Prof. Conduct 3.3 2004 ABA Model Code Comment [2] ("This Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process."). His repeated failures to be candid before the Board of Medicine and the trial court evidenced a practice of omitting information in official proceedings — a practice that the trial court could reasonably have been concerned would continue. Thus, given these

13

facts, we conclude that the trial court did not err when it considered Walter's medical disciplinary history — and his failure to voluntarily disclose it — as evidence that his pro hac vice admission could be "detrimental to the prompt, fair and efficient administration of justice." Super. Ct. Crim. R. 19(c)(1).

In sum, the trial court examined whether the pro hac vice admissions of Walter and Alexandria could detrimentally impact its interest in the ethical, fair, and orderly administration of justice, and the defendant's defense. It then thoughtfully weighed the detrimental impact of the admissions on the ethical, fair, and orderly administration of justice against the defendant's right to a lawyer of his own choosing. The record establishes an objective basis for the trial court's determinations, and the defendant has not shown that the trial court's rulings were clearly unreasonable or untenable to the prejudice of his case. Therefore, we conclude that the trial court sustainably exercised its discretion when it reconsidered and vacated its prior order, and then denied the Jacobses' pro hac vice applications.

The State Constitution provides at least as much protection of the defendant's right to chosen counsel as the Federal Constitution. See Panzardi-Alvarez, 879 F.2d at 980-81. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

Finally, the defendant argues that the trial court erred when it resolved factual disputes without conducting an evidentiary hearing, and, therefore, we must vacate the order and remand the case for an evidentiary hearing. He asserts that remand is necessary because the trial court resolved factual disputes about the Jacobses' relationships with L.J. and her family without holding an evidentiary hearing. The State counters that the relevant facts relied upon by the trial court were undisputed, obviating any need for a hearing. We agree with the State.

The facts material to the trial court's decision were not in dispute — it was uncontested that, at the time of the assaults, Walter had a physician-patient relationship with L.J., her sister, and her mother, and that Alexandria was friendly with L.J. and her sister. The precise nature of these relationships was immaterial to the reasoning of the trial court. Because the facts material to the trial court's decision were undisputed, no evidentiary hearing was necessary. We find no error.

Affirmed.

CONBOY, J., sat for oral argument but did not participate in the final vote; DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.

14